D1N8LEYC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            13 Cr. 55 (GBD)

5    ROGELIO LEYBA,

6              Defendant.

7    ------------------------------x

8                                      January 23, 2013
                                       10:50 a.m.
9
     Before:
10
                      HON. GEORGE B. DANIELS
11
                                       District Judge
12
                           APPEARANCES
13
     PREET BHARARA
14        United States Attorney for the
          Southern District of New York
15   EDWARD DISKANT
          Assistant United States Attorney
16
     LINDSAY LEWIS
17        Attorney for Defendant

18
     Also present:  JEFFREY STEIMEL, Pretrial Services
19                   MATILDE DEFERRARI, Spanish interpreter

20

21

22

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

D1N8LEYC

1          (Case called)

2          THE DEPUTY CLERK:  Would the parties please rise and

3     state their appearances for the record, starting with the

4     government.

5          MR. DISKANT:  Good morning, your Honor.  Edward

6     Diskant for the government.  And I am joined by Jeff Steimel of

7     Pretrial Services.

8          MS. LEWIS:  Good morning, your Honor.  Lindsay Lewis,

9     standing in for Josh Dratel, on behalf of Rogelio Leyba.

10          THE COURT:  What is the status from the government's

11     perspective?

12          MR. DISKANT:  We are here primarily for an arraignment

13     today.  The defendant was charged by complaint in December and

14     arrested on that basis and presented on that basis as well.  He

15     was indicted on these charges last week.

16          THE COURT:  The indictment has not yet been filed?

17          MR. DISKANT:  My understanding is that it is.  The

18     paperwork may have been lost in the shuffle.  This was indicted

19     as one of two cases.  I know the other case, the paperwork was

20     stamped and made its way to Judge Gardephe's chambers.

21          THE COURT:  But you don't have a docket number yet?

22          MR. DISKANT:  I don't.

23          THE COURT:  Ms. Lewis, have you received a copy of the

24     indictment and had an opportunity to review it with your

25     client?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D1N8LEYC

1              MS. LEWIS:  I did, your Honor.

2              THE COURT:  Do you waive its public reading?

3              MS. LEWIS:  I do, your Honor.

4              THE COURT:  Do you wish to enter a plea on his behalf?

5              MS. LEWIS:  We wish to enter a plea of not guilty.

6              THE COURT:  I will enter a plea of not guilty on his

7      behalf.

8              What is the status from the government's perspective

9      with regard to discovery?

10             MR. DISKANT:  Your Honor, the first round of discovery

11     was handed to Ms. Lewis this morning.  It consists of certain

12     consensually recorded phone conversations and meetings

13     involving the defendant.  There also were a number of physical

14     items seized from the defendant pursuant to a search warrant

15     executed at the time of his arrest, I provided a voucher of

16     those items, which we will make available to defense counsel's

17     inspection.  The only remaining item to the government's

18     knowledge is at least one computer that was seized pursuant to

19     the same search warrant.  That is in the hands of our forensic

20     team, and as soon as it's available to be produced we will do

21     so.

22             THE COURT:  Ms. Lewis, how much time would you want to

23     review discovery before we came back?

24             MS. LEWIS:  Your Honor, Mr. Dratel is actually on

25     trial at the end of this week for the next six weeks or so in

D1N8LEYC

1   San Diego.  So I would ask your Honor for a date after that if

2   possible, and we also have another trial commencing before

3   Judge Stein on April 1, just to permit some time to properly

4   review the discovery.

5            THE COURT:  What week would you be looking at?

6            MS. LEWIS:  Could we do April 15, your Honor?

7            THE COURT:  I can give you that week but not that day.

8            MS. LEWIS:  Unfortunately, I don't have Mr. Dratel's

9   schedule in front of me.  Would your Honor like to pick a date

10  convenient to the Court and we can notify chambers?

11           THE COURT:  What about the 16th?  I can set it down on

12  the 16th at 9:45.

13           MS. LEWIS:  Yes, your Honor.

14           THE COURT:  What is the situation with regard to bail?

15  What is the defense or government's position?

16           MS. LEWIS:  Your Honor, perhaps I can raise this.  The

17  issue is that Mr. Leyba was originally permitted by the

18  magistrate, one of the conditions of bail was that he would be

19  permitted to work, and was initially released 6 a.m. to 6 p.m.

20  from his home detention in order to do so.  And it was the

21  understanding when bail was set that Mr. Leyba would be

22  permitted to work at the bodega located at 23 Crane Street,

23  which is owned by his father.  It is a legitimate business.

24  There has never been a question of that.  He would be able to

25  work at this bodega that he has worked at for, I believe, the

D1N8LEYC

1      last 12 or 13 years.  And sometime after he was initially

2      authorized to do so, pretrial services then informed him that

3      he would not be permitted to work there -- he would be

4      permitted to work, but not there, because they believed that

5      the alleged criminal activity had taken place at the bodega.

6              I would note, however, the criminal activity alleged

7      in the complaint was not alleged to have taken place at the

8      bodega, but, rather, at the apartment located above the bodega,

9      which is actually Mr. Leyba's primary residence, but which he

10     is not currently residing in.  He is currently residing with

11     his sister.

12             So I would ask, given that the criminal activity is

13     not even alleged to have taken place at the bodega, that he be

14     permitted to continue to work there, in key part because Mr.

15     Leyba has child support obligations in New Jersey.  Pretrial is

16     aware of those, and he really needs this job in order to meet

17     child support obligations.  And considering the indictment in

18     this case, and the fact that he is on home detention, it would

19     be very difficult for him to go out, find and obtain employment

20     elsewhere, especially considering that English is his second

21     language.

22             THE COURT:  Is there someone in that apartment

23     currently?

24             MS. LEWIS:  No.  There is no one in that apartment at

25     this time.

D1N8LEYC

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | THE COURT:  What is the government's position?               |
| 2  | MR. DISKANT:  Your Honor, the government has a number        |
| 3  | of problems here.                                            |
| 4  | First and foremost, so the Court is aware, the               |
| 5  | government opposed release and there was an extended detention |
| 6  | argument before Judge Netburn.  I forwarded a copy of the    |
| 7  | transcript to your clerk.  We can get you a copy of the      |
| 8  | transcript should you wish to review it.  I simply disagree  |
| 9  | with Ms. Lewis's characterization of the understanding of the |
| 10 | parties at that time.  We will note Ms. Lewis was not actually |
| 11 | there.                                                        |
| 12 | THE COURT:  Slow down.                                        |
| 13 | MR. DISKANT:  The understanding of everyone at the           |
| 14 | time of the hearing was that the store and the abandoned     |
| 15 | apartment building, which is directly above it and which Mr. |
| 16 | Leyba was living in at the time of the apartment, had all been |
| 17 | a part of the criminal conduct that was charged in what was at |
| 18 | that time a complaint and is now an indictment.  It was for  |
| 19 | that, among other reasons, that when Judge Netburn set       |
| 20 | conditions of release she specifically provided that he could |
| 21 | not continue to live in that apartment at the bodega, but had |
| 22 | to instead live with his sister.                             |
| 23 | The government's view is that the bodega was the front       |
| 24 | from which Mr. Leyba ran this organization as alleged -- or  |
| 25 | criminal activity I should say, as alleged in the complaint. |

D1N8LEYC

1    He would meet the cooperating witness to whom he sold these

2    drugs in the bodega.  We have every reason to believe that he

3    met other individuals that he bought from and sold to in the

4    bodega.

5            I would add that since the time of the arrest, the

6    government has developed additional information which gives it

7    pause about Mr. Leyba's connection with this bodega.  That

8    information, which I have just handed to Ms. Lewis, includes

9    information that Mr. Leyba has failed to disclose income earned

10   from the bodega, has materially misrepresented his income in

11   mortgage applications, and was in the process of obtaining some

12   sort of financing as well as property to open a new store

13   nearby.

14           THE COURT:  Give me a better idea of what you claim is

15   going on in the bodega.

16           MR. DISKANT:  Our understanding, your Honor, is that

17   Mr. Leyba was using the bodega to meet people who sell

18   secondhand prescription drugs, which is the core of the

19   allegation in this indictment; that is, people who are buying

20   HIV medications, primarily from Medicaid beneficiaries, and

21   then reselling them to aggregators like Mr. Leyba, who collect

22   these bottles and then sell them on to much higher level

23   aggregators, who in turn pass them on to corrupt pharmacies and

24   back into the stream of commerce.

25           In addition to the sales that were recorded by the

D1N8LEYC

government, the government seized approximately 450 additional

bottles of secondhand prescription drugs in the apartment above

the bodega that we have been speaking of.

        THE COURT:  Is there any other connection between the

owner of the bodega or the people who work in the bodega and

the offenses that are charged here, or you're suggesting during

the period of time that he was working there, that's the place

where he did these transactions?

        MR. DISKANT:  It's primarily the latter.  We have

every reason to believe that were Mr. Leyba to be allowed to

return to the bodega, and to be clear, we have no indication

there are any other employees there, but were he allowed to

return to the bodega, he would have every reason to be in

contact with people who would come by the store, because they

had previously done precisely the sort of business alleged in

the indictment with Mr. Leyba, that is, all of his prior

sellers and buyers, who knew him from the store and would meet

him at the store, and then be taken by Mr. Leyba from the store

up to this apartment directly above it to actually engage in

the transactions.

        THE COURT:  What are you afraid is going to happen?

        MR. DISKANT:  He will continue to engage in these

sales when presented with the opportunity to do so.

        THE COURT:  That would be pretty stupid.

        MR. DISKANT:  I completely agree.

D1N8LEYC

1          THE COURT:  Since the agents are looking right over

2    his shoulder.

3          MR. DISKANT:  It is very hard for the agents to engage

4    in 24/7 surveillance of the store, your Honor.

5          THE COURT:  I assume to some extent you have

6    identified other individuals other than the cooperator, if not

7    by name but by face, as to who the defendant was allegedly

8    dealing with.

9          MR. DISKANT:  We have certainly identified numerous

10   other people who are involved in this conspiracy.  The

11   government has currently charged approximately 60 individuals

12   in various different charging instruments.  We are talking

13   about a multi-state conspiracy that involved tens, if not

14   hundreds of millions of dollars worth of secondhand medication.

15   So to say that we have knowledge of every single person who is

16   involved in it would obviously be overstating it.  We

17   definitely continue to investigate.  We have additional

18   targets.

19         THE COURT:  What is the approximate number of

20   individuals who have been coming in and out of this bodega

21   involved in this activity?

22         MR. DISKANT:  I wouldn't speculate, your Honor.  I

23   will say that the defendant engaged in two separate sales to

24   the cooperating witness working with the government.  Both of

25   those sales involved approximately 50 bottles of secondhand

D1N8LEYC

1   pills.  At the time of his arrest, the defendant had an

2   additional 450 bottles or approximately nine sales worth in

3   stock.  So the government would speculate that he was doing

4   this with some frequency with other individuals.

5            THE COURT:  The bodega is owned by his father?

6            MR. DISKANT:  That is our information.  His father is

7   in the Dominican Republic and not here.  I should add that the

8   defendant is not a citizen.  He is likely facing deportation

9   should he be convicted.

10           THE COURT:  Who else is working or running the store?

11           MR. DISKANT:  We have no information to lead us to

12   believe that anyone else is running the store.  I don't believe

13   anyone else was there at the time of the arrest.  I am not

14   aware of the agents seeing anyone else in the store during any

15   of the sales that were reported.

16           THE COURT:  Has the store been closed?  When did he

17   get arrested?

18           MR. DISKANT:  He was arrested on December the 20th.

19           THE COURT:  Ms. Lewis, has the store been closed since

20   then?

21           THE DEFENDANT:  This was my father's bodega.

22           MR. DISKANT:  While the defendant is conferring, these

23   are the documents that I referred to.  I provided a copy to

24   defense counsel as well.

25           MS. LEWIS:  There is one employee currently working at

D1N8LEYC

 1    the store.  His name is Miguel.  He is in no way linked to this

 2    case.  The responsibility for running the store is Mr. Leyba.

 3    As you understand, the store is owned by his father, and he is

 4    the one keeping a completely legitimate business operational.

 5         I would also stress that what the government has just

 6    mentioned here, none of this is new information -- with the

 7    exception of these 400 new bottles the government refers to,

 8    none of this is new information that the magistrate court was

 9    not aware of at the time that they set bail in this case.  In

10    fact, this information that the government has just explained

11    is all listed very clearly in the complaint.  The complaint

12    makes clear that while people may have met up with him at the

13    bodega, no drugs were alleged to have exchanged hands there.

14    There were no illegal transactions that were alleged to have

15    taken place in the bodega.  If anything, they moved outside of

16    the bodega to the apartment, and just to the apartment, to

17    transact these alleged exchanges.

18         So I would stress that there are no changed

19    circumstances here and there is no reason to deny him his right

20    to work in the bodega, as the magistrate court had said, and to

21    be able to pay his child support in this case.

22         THE COURT:  Was this issue discussed with the

23    magistrate judge?  What way was it that the magistrate judge

24    said he could work, precluding him from going to the apartment,

25    but anticipated what about the bodega and what about the way he

D1N8LEYC

1   was going to work?

2           MS. LEWIS:  My understanding, I was not present there,

3   Mr. Dratel told me at that appearance it was very clear to all

4   parties that he would be permitted to work in the bodega.  I

5   understand from Mr. Leyba that perhaps the issue with him

6   living in the apartment actually had more to do with the fact

7   that there had been a misunderstanding that there was no phone

8   line in the apartment, and that may have been part of the

9   reason.  Again, I am just going on what my client said, not

10  what Mr. Dratel has said about this particular issue, but that

11  may have contributed to why he had been disallowed to stay in

12  the apartment.  Apparently, there is a phone there.

13          Nonetheless, he is staying with his sister and that

14  condition can remain.  He does not need to go into the

15  apartment should the Court continue to wish that to be the

16  case.  With the exception of what was already stated before,

17  that the magistrate court was aware of, people may have met him

18  at the bodega and then left there to transact illegal business,

19  there is no allegation that that bodega is in any way linked to

20  criminal activity.  It is a legitimate business.

21          THE COURT:  Was it anticipated by the magistrate judge

22  that he would find a new job or that he would work at the

23  bodega?

24          MS. LEWIS:  No.  It was absolutely the understanding

25  that he would work at the bodega.

D1N8LEYC

1          MR. DISKANT:  I just tried again to forward a

2     transcript of the proceedings to your clerk so the Court can

3     review it.  That's simply not accurate.  Both the government

4     and pretrial services, who were at the bail hearing, came away

5     with a completely different impression, which was that Judge

6     Netburn shared the government's concern about this particular

7     location, which is why she was not allowing him to live there.

8     The phone line was hardly the issue.  This is an otherwise

9     abandoned building that is padlocked from the outside.  Mr.

10    Leyba would meet his buyers and sellers in the bodega, walk

11    them up, take the padlock off the door into this abandoned

12    building where he stored the drugs.

13         THE COURT:  It's interesting that you say the

14    prohibition was that he could not go to the apartment, not that

15    he could not go to the bodega.

16         MR. DISKANT:  Well, your Honor, the condition was that

17    he couldn't live in the apartment, because what he wanted to do

18    was live in the apartment.  Judge Netburn added at the very end

19    that he could seek work.  There was no other discussion of

20    work.  There is certainly no discussion of him going back to

21    work at the bodega.  Had that been expressly raised, the

22    government certainly would have opposed it.

23         I should add Mr. Steimel reminds me, while the

24    defendant is out on electronic monitoring, pretrial has no way

25    of determining, based on that monitoring, whether he is on the

D1N8LEYC

1    first floor of the building or the second floor of the

2    building, so there really would be no way to ensure that he was

3    staying only in the bodega.

4            The final thing I wanted to note, and I just handed up

5    to your Honor a stack of documents that were recovered from

6    this abandoned apartment building pursuant to the search

7    warrant.  These in order are a loan application from the Bank

8    of America for a building in Newark, New Jersey, in which the

9    defendant substantially misstates his income and defaults on

10   his tax returns, showing that he either is committing tax fraud

11   or misstating his income to Bank of America.  Then, finally, a

12   series of documents in which the defendant is obtaining

13   financing and property for a new store nearby.  And I raise

14   these primarily because none of this was disclosed with his

15   financial history at pretrial at the time of the bail

16   application.  All of this certainly would have given the

17   government additional concern about his release and would have

18   been argued extensively before Judge Netburn had the defendant

19   not failed to truthfully disclose it at that time.

20           THE COURT:  I have a copy of the transcript of the

21   bail proceeding?  Can you direct my attention to anything in

22   the transcript that is directed at this issue?

23           MR. DISKANT:  Candidly, my only recollection of work

24   being discussed at all was at the very, very end of the

25   proceeding, probably the last page or two, in which Judge

D1N8LEYC

1   Netburn was reciting the conditions of bail.  And after

2   ordering him to be held on electronic monitoring and to live at

3   a location other than his own house, I believe she said

4   something to the effect the defendant can seek work.

5           THE COURT:  Let me just look at the transcript.

6           (Pause)

7           THE COURT:  Was there a search conducted of the

8   apartment and the bodega?

9           MR. DISKANT:  The search was limited to the apartment,

10  your Honor.

11          (Pause)

12          THE COURT:  What exactly are the bail conditions?  Is

13  there a $100,000 bond secured by 5,000 in cash?

14          MR. DISKANT:  That's correct.

15          THE COURT:  How many cosigners?

16          MR. DISKANT:  Two.  Neither of them, candidly, is

17  terribly impressive in terms of the financially responsible

18  component, but given Judge Netburn's order, the government did

19  its best to accommodate them.

20          THE COURT:  Are they employed?

21          MR. DISKANT:  One of them is.

22          THE COURT:  Do you have the defendant's passport?

23          MR. DISKANT:  The agent should have it, your Honor.

24          THE COURT:  Well, I see in the transcript that the

25  government pointed out to the magistrate judge that the

D1N8LEYC

defendant sought employment in a store that the government

believes he was using as a front of the drug conspiracy that is

charged in the complaint.  The only other reference to the job

is the magistrate judge's condition of bail that he will be

permitted to leave the home for employment, medical

appointments, and to visit counsel.

Given that information, the magistrate judge didn't

set any condition, knowing that he worked at that location,

didn't set any condition that he should find different

employment as I see it here.  It seems to me it's reasonable

that the magistrate judge anticipated that this is where he was

going to be working and that not working there wasn't a

condition of his bail.

That being the case, and the circumstances not having

changed from the time the magistrate judge set the bail, I

think adding an additional condition now that he cannot work at

this location, I don't see that being compelling at this point.

At this point, I think the restrictions on the apartment should

stay in place.  At the time, it was indicated to the magistrate

judge it was his only employment.  Although there may have been

criminal discussions at this location in the bodega, the

location alone doesn't compel me that he should be precluded

from working at his sole employment.

Additionally, as I indicated, I think he would be

quite foolish to engage in further activity at this location,

D1N8LEYC

```
 1   and, quite frankly, I am not sure, he may or may not come in
 2   contact with people that the government believes are involved
 3   in this kind of activity, but given the nature of his bail
 4   conditions, it could just as well happen on the streets
 5   someplace, as opposed to happen at the bodega, when the
 6   defendant is out from under home confinement.
 7             MR. DISKANT:  Most respectfully, I appreciate this is
 8   not technically charged as a Title 21, Section 841 provision;
 9   nonetheless, the government's view of the defendant here is
10   that he has been engaged in drug dealing.  This is the effect
11   of sending a dealer back out on the streets and telling him he
12   is perfectly free to hang out on his old corner, just don't
13   hang out with the same people you were dealing drugs with.
14             THE COURT:  That's an the argument you had the
15   opportunity to make at the time Judge Netburn set the bail.
16   She did not set that restriction nor did you ask her to set
17   that restriction.
18             MR. DISKANT:  Again, having been there myself, having
19   pretrial there, it was not the understanding of anyone at the
20   time that that was what Judge Netburn was saying.  She doesn't
21   mention employment until the very, very end.  No one understood
22   it to mean she was expressly permitting him to go back to the
23   store.
24             THE COURT:  I have looked at the transcript.  I am not
25   sure where I am supposed to look at the transcript to interpret
```

18

D1N8LEYC

1   the transcript to mean that you asked her or she intended to

2   put any restriction on his employment.  You told her he had

3   sole employment at the bodega, and she said that he could leave

4   the house only for employment.  What other employment could she

5   be referring to unless she told him that he couldn't work there

6   and he had to get another job?

7       MR. DISKANT:  Two responses.  First is that both

8   pretrial and the government didn't hear it that way

9   contemporaneously.  I think the transcript speaks for itself.

10  We just didn't hear it that way.  Certainly, had we heard it,

11  we both would have objected, because as pretrial has told me,

12  and will tell you, they have no way of ensuring on these facts

13  that the defendant is staying in the bodega as opposed to going

14  up to the apartment based on the electronic monitoring that

15  Judge Netburn ordered.

16      Secondly, this Court has the right to revise those

17  conditions, and the basis for revising those conditions are

18  that now the defendant is in fact out, now the parties clearly

19  understand -- the request to include a request not simply to

20  seek employment but to go back to the store, the government and

21  pretrial are here explaining to you why they view that as a bad

22  idea and a difficult way to monitor the defendant.

23      The final thing is that there are changed conditions,

24  which is the government has additional information, which it

25  continues to investigate, that leads us to believe that the

D1N8LEYC

         defendant has not been fully forthcoming with pretrial, with

         the Court, in engaging in the various criminal activities that

         he is involved in, which should give the Court some pause about

         his ability to maintain a law-abiding life while out on

         pretrial release, and at the exact place where he met all of

         his buyers and sellers for the conspiracy that is charged.

                    THE COURT:  If your argument is simply that you are

         fearful that he is going to go back to the bodega and continue

         to sell drugs out of the bodega, that's not a particularly

         compelling argument.  Obviously, that would be quite difficult

         and quite foolish under the circumstances to sell drugs out of

         the bodega given his bail conditions.  The government obviously

         has the ability, whether he goes to the bodega or not, to

         conduct a further investigation if they believe there is a

         reasonable basis to believe that he is selling drugs out of the

         bodega.  But the bottom line is that if he is going to be out,

         he can sell drugs, whether he does it by telephone or someplace

         else out on the street, someplace else if he gets another job.

         I'm not sure that the bodega itself is the critical point of

         the issue as to whether or not he is going to be selling drugs.

         Quite frankly, I think it is more unlikely, if he is going to

         sell drugs, he is going to sell it someplace else other than

         the bodega because that's where he got caught.

                    I don't think the circumstances have significantly

         changed, and I think it's a close question given the way the

D1N8LEYC

transcript reads.  It appears to me the scenario that

Magistrate Judge Netburn had anticipated, in terms of bail

conditions, don't indicate any other scenario other than that

she was told that this is where he worked, in the bodega, that

that's his sole employment.  She restricted him from going to

the apartment, she did not restrict him from going to the

bodega, and she said that the bail conditions were that he

should be on home confinement except for when he goes to work.

        As I say, I think it's a close question, but I think

given the nature of this offense, and given the nature of the

evidence and the bail that's already set in this case, I think

that I can only interpret that what Judge Netburn intended is

that she intended that he be able to continue to work.  At this

point, I don't see a compelling reason to overrule that

determination and say that was an unreasonable determination by

her to anticipate that he would be able to continue to work in

this bodega.

        So given his financial responsibilities, his family

responsibilities, I think that it makes sense for him to

continue to work.  Obviously, if he is foolish enough either in

the bodega or someplace else while he is on bail to have

further contact or discussion with co-conspirators or others

who are interested in buying or selling drugs, that would be a

foolish thing to do and a basis for totally revoking his bail

as an indication that he is a danger to the community and/or

D1N8LEYC

1    can't abide by the conditions of his release.

2              Given the way the bail was set, and given that it's

3    simply now the government and pretrial's position that

4    additional restrictive conditions should be imposed indicating

5    that he cannot continue to work at the current location and

6    must find a new job at a different location, under those

7    circumstances, I don't think that is consistent with the bail

8    that Judge Netburn set, having had her consider the total

9    issues.  I am going to not restrict him with regard to working

10   in the bodega.  He is still restricted from the apartment and

11   upstairs over the bodega.  As long as it appears that he is

12   simply engaged in lawful employment at this bodega, I think

13   that that's appropriate and consistent with the bail conditions

14   set by Judge Netburn.

15             We will adjourn till the next date.  If there is a

16   further problem with this, let me know and I will reconsider

17   it, but at this point he should continue to be employed.  I

18   think we are better off if he is still working than just

19   wandering around the streets trying to look for another job.

20             MR. DISKANT:  The government would seek an exclusion

21   of time between today's date and April 16 to permit defense

22   counsel to review the discovery and determine what, if any,

23   motions might be appropriate.

24             THE COURT:  Any objection?

25             MS. LEWIS:  No, your Honor.

D1N8LEYC

1          THE COURT:  I will exclude the time in the interests

2     of justice to facilitate that review and availability for the

3     next conference.  I will see everyone on April 16 at 9:45.

4          (Adjourned)