E936leys

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                        13 CR 55(GBD)

5  ROGELIO LEYBA,

6                Defendant.

7  ------------------------------x

8                                    New York, N.Y.
                                     September 3, 2014
9                                    10:30 a.m.

10

11 Before:

12                HON. GEORGE B. DANIELS,

                                     District Judge
13

14                    APPEARANCES
   PREET BHARARA
15      United States Attorney for the
        Southern District of New York
16 EDWARD B. DISKANT
        Assistant United States Attorney
17
   WILENS & BAKER, P.C.
18      Attorneys for Defendant
   DANIEL S. KRATKA
19

20

21

22

23

24

25

E936leys

1          (In open court; case called)

2          THE LAW CLERK:  Will the parties please rise and make

3     their appearances starting with the government.

4          MR. DISKANT:  Good morning, your Honor.  Edward

5     Diskant for the government.

6          THE COURT:  Good morning, Mr. Diskant.

7          MR. KRATKA:  Good morning.  My name is Daniel Kratka,

8     and I represent Mr. Leyba.

9          THE COURT:  Good morning, Mr. Kratka and Mr. Leyba.

10         Mr. Kratka, have you received a copy of the

11    presentence report and had an opportunity to review it with

12    your client?

13         MR. KRATKA:  Yes, I have, your Honor.

14         THE COURT:  Do you have any objections or corrections

15    to be made to the report itself?

16         MR. KRATKA:  No, your Honor.

17         THE COURT:  Let me first turn to the government.

18         Mr. Diskant, do you wish to be heard first on

19    sentencing?

20         MR. DISKANT:  Your Honor, the government worked very

21    extensively with Probation on a very detailed PSR, which I know

22    the Court has had an opportunity to review.  Therefore, I

23    didn't feel the need to put in an additional submission.  As

24    detailed in the presentence report, the defendant was involved

25    in a much larger scheme to defraud Medicaid and potentially

E936leys

hurt HIV/AIDS patient business redistributing secondhand HIV

medications.  He did so from a base of operations in New

Jersey.  And consistent with the recommendation of Probation

and in light of the defendant's conduct, the government

believes a sentence within the advisory guidelines range is

appropriate.

As discussed in some detail in the defense submission,

it is true the defendant made some attempts to provide

assistance to the government.  As the Court can tell from the

docket in this case, sentencing was adjourned on a number of

occasions to allow those efforts to go forward.  They

ultimately didn't come to fruition, which is why there is no

5K1 letter in this case.  It is certainly true and the

government does not dispute that the defendant on a series of

occasions made attempts to provide assistance to government

investigators.

THE COURT:  I don't believe I had any codefendants in

the related cases.  Were there other codefendants in related

cased that were prosecuted and what was the result?

MR. DISKANT:  There were approximately 60 cases and 48

of them are pending before Judge Cote.  That case is United

States v. Viera.  The defendants in that case have been

sentenced from anywhere to probation to well over 100 months in

prison depending on the scope of their involvement.  There are

also a series of other defendants pending before Judge

1    Hellerstein, Judge Gardephe and Judge Sweet involving other

2    participants in this scheme.  In terms of other people on the

3    defendant's level, some of the closest comparisons would be

4    Juan Cocharto, who is pending before Judge Hellerstein who was

5    sentenced to 30 months' imprisonment.  There is Arcadeo Reyes

6    Arias, a defendant pending before Judge Gardephe, and he has

7    not yet been sentenced.

8            THE COURT:  Is there a reason why this is a separate

9    case from the others?

10           MR. DISKANT:  Yes, your Honor.  The defendant was

11   arrested at a separate time and based on a separate complaint,

12   and the Judge Cote stopped accepting the consolidated cases

13   after a certain point.

14           THE COURT:  Was he alleged to be in a conspiracy with

15   the other defendants or was he separately charged?

16           MR. DISKANT:  He was charged separately, your Honor.

17   I apologize.  To clarify, when I say they are related cases,

18   there was one large-scale investigation launched with the

19   health care task force of the FBI into this particular scheme.

20   Then I guess the best analogy would be a spoke and wheel

21   conspiracy, which is to say there were a number of different

22   pockets of the conspiracy.  This particular defendant was not

23   directly associated with all of or many of the people charged

24   in the big case before Judge Cote.  He was involved with

25   several of the them and those are the individuals who are

E936leys

1    identified in the complaint as the cooperators who ultimately

2    led us to the defendant, which is how the defendant was

3    ultimately charged.  Those cooperators have not yet been

4    sentenced.

5         THE COURT:  What is the nature of his coordinated

6    activity with other defendants?

7         MR. DISKANT:  Certainly, your Honor.  The way the

8    defendant participated in the scheme was that he would purchase

9    secondhand bottles -- what we called secondhand bottles of

10   medication from insurance beneficiaries both here in New York

11   and on the streets of Newark, New Jersey.  He would then resell

12   those bottles to higher level aggregators.  Those are the

13   primary coconspirators whose involvement we have focused on.

14   We have not charged the insurance beneficiaries who by and

15   large sold their bottles.

16        One of the large-scale aggravators this defendant sold

17   to is an individual what we identify as CW1 in the complaint.

18   He is certainly part of the larger conspiracy that is charged

19   in the big case.  CW1 would in turn aggregate bottles that he

20   purchased from individuals like this defendant and resell them

21   directly to corrupt wholesale distributors who in turn would

22   feed them back to the chain of circulation.

23        THE COURT:  So in the chain of activity, this

24   defendant would sell to aggregators who would then sell to

25   distributors?

1          MR. DISKANT:  Correct, your Honor.

2          THE COURT:  Pharmaceutical distributors?

3          MR. DISKANT:  Exactly.

4          THE COURT:  Basically the pharmaceutical distributors

5     were getting prescription drugs from the street at a cheaper

6     price and filling their other individual's legitimate

7     prescriptions with those drugs?

8          MR. DISKANT:  That's exactly right, your Honor.  At

9     the very end stage of the scheme, pharmacies were

10    redistributing these bottles to unsuspecting patients and

11    Medicaid was paying the full price, which was upwards of $1,800

12    a bottle.  The the pharmacies and/or distributors were making

13    massive profits by purchasing these off the streets in essence

14    for pennies on the dollar before redistributing and seeking

15    full reimbursement.

16         THE COURT:  It doesn't involve either expired or

17    adulterated or fake drugs?

18         MR. DISKANT:  It does involve adulterated drugs.  Part

19    of the scheme, and the defendant allocuted to this and it is

20    discussed in the presentence report, in order to make these

21    bottles appear to be new, the scheme participants would use

22    lighter fluid and other dangerous chemicals to peal the patient

23    label off of the bottles.  The defendant had some participation

24    in this.  Certainly the people the defendant sold to had quite

25    a bit of participation in this.  As part of the investigation

E936leys

1   in this case, we subjected or had the retailers subject bottles

2   that we recovered as part of the scheme's testing, which

3   determined in fact that chemicals -- things like lighter

4   fluid -- did seep into the bottles as part of that treatment.

5           More generally they were adulterated in the sense that

6   people like the defendant were storing these bottles in

7   unsanitary conditions.  We executed a search warrant on the

8   defendant's residence at the time he was arrested and we

9   recovered a number of these bottles in boxes and otherwise

10  being stored just in his apartment, which may not sound sort of

11  in the ordinary course of all that big of a deal, but many of

12  these drugs have very specific requirements for the temperature

13  they need to be kept at and the conditions in which they need

14  to be stored, and none of those requirements were being met by

15  the scheming participants.

16          THE COURT:  What is the period of time and the

17  estimate of his proffer in this case?

18          MR. DISKANT:  The defendant is being charged for his

19  participations during a relatively finite period as a condition

20  of the plea agreement.  So consistent with the plea agreement,

21  I am going focus the Court on two particular sales that the

22  defendant engaged in, sales of pills, of bottles to one of our

23  cooperators.  Both of those sales occurred in the late summer

24  and full of 2012 before his arrest in August of 2012.  We then

25  executed a search warrant at the time of the defendant's arrest

1   and recovered a number of additional bottles at that time, and

2   it is the Medicaid reimbursement value of those bottles, that

3   is the bottles that the defendant sold highlighted in the PSR

4   as well as the bottles recovered from his apartment, that we're

5   holding him individually responsible for.

6          The defendant's actual in-pocket profits are a little

7   bit more difficult to measure.  In no small part because of the

8   nature of the scheme involved the defendant buying these

9   bottles on the cheap and then reselling them cheaply.  So

10  certainly the defendant made substantially less himself than

11  the loss caused to Medicaid.  I will direct the Court to the

12  fact that only two occasions our cooperator purchased bottles

13  from the defendant, on each of those occasions he paid

14  approximately $5,000 for the bottles that he was purchasing.

15         THE COURT:  What is the period of time that you have

16  evidence that he was engaged in this activity?

17         MR. DISKANT:  Again, I want to be consistent with the

18  terms of the plea agreement.  I think it is certainly true, and

19  I don't think the defendant would dispute, that had he gone to

20  trial the government would have sought to prove the defendant's

21  involvement in the conspiracy for quite a number of years.

22  Again, for purposes of the plea agreement, we're holding the

23  defendant responsible for the sales that occurred over

24  approximately a six-month period in 2012.

25         THE COURT:  You say that the volume of sales over that

1    period of time that I should hold him responsible for?

2              MR. DISKANT:  Certainly the two sales that were

3    conducted with our cooperating witness, each of which involved

4    a number of bottles.  The PSR details both of them.  For

5    example, paragraph 26 details the November 30th sale, which

6    involved approximately 60 bottles of secondhand medication

7    which were sold from $5,000 in cash.  The medicaid

8    reimbursement value of those bottles was approximately $61,000.

9    Turning back a page to paragraph 24 it details an August 14,

10   2014 sale, which also involved approximately 60 bottles of

11   secondhand medication, which were sold for approximately the

12   same price and had a Medicaid reimbursement value of

13   approximately $36,000.  So those are two sales that certainly

14   we know all of the particulars of.

15             There was as search warrant executed at the

16   defendant's arrest at the time that he was arrested and there

17   are approximately 100 additional bottles recovered at that time

18   with a Medicaid reimbursement value of $100,000.  We submitted

19   a proposed restitution order to the Court, which is the basis

20   for the loss calculation in the plea agreement with the

21   combined value of the bottles that I just spoke as coupled with

22   the value of the bottles recovered from the defendant's

23   apartment when the search warrant was executed.

24             THE COURT:  Thank you.

25             Mr. Kratka, do you want to be heard?

E936leys

1          MR. KRATKA:  Yes, Judge.  Did the Court receive my

2     presentence memo?

3          THE COURT:  Yes.

4          MR. KRATKA:  I just wanted to highlight a couple

5     things.  The government and I do not disagree with regard to

6     the facts of this case.  First, your Honor, I would say for the

7     record that my client is joined this morning by his aunt and

8     niece.  He lives with them.  As well as one of his five

9     daughters who is 14, Valerie.  His other children are much

10     younger and was inappropriate to bring them to court this

11     morning.  They are here in support, your Honor.

12          Your Honor, as I said the government and I don't

13     dispute this case before your Honor is part of a much, much

14     greater case of approximately 60 defendants who were engaged in

15     this conspiracy fraud and there were various levels of which

16     the participant took place.  At the lower level, your Honor,

17     there were these collectors, people such as my client, your

18     Honor, who lived in neighborhoods who worked at bodegas and who

19     had access to low-income individuals who were looking to and

20     needed to sell medication in order to support themselves and he

21     acted as the conduit in which to obtain those medications.

22     Those medications then went up the ladder and were sold to

23     aggregators.  Those were people who bought from many different

24     collectors.  And even within the aggregators there were

25     low-level aggregators and high-level aggregators based on

1    volume and how many collectors they were purchasing it from.

2         Then you went from there, your Honor, to these corrupt

3    distribution companies who ultimately bought these drugs and

4    then sold them to the unsuspecting pharmacies for a greater

5    profit.  Obviously, your Honor, as you go up the chain, the

6    profit to these defendants increased expedientially there.

7         I should say, your Honor, what I made clear in my

8    presentence report, is that these other cases of approximately

9    60 defendants, and one of the cases had 48 defendants, which is

10   in front of Judge Cote, if you read through that indictment,

11   many or most of the individuals charged in that indictment were

12   part of organized crime.  They are referred to as the criminal

13   organizations of X and of Y.  They were operating in a very

14   formulaic way.  That indictment in front of Judge Cote was

15   brought by the organized crime division of the United States

16   Attorney's Office.  Mr. Diskant is not part of that organized

17   crime unit and this case was not brought under that rubric; but

18   simply, your Honor, I point that out for the fact that those

19   cases not only involved many of these higher-level participants

20   in the conspiracy who profited greatly, but they also involved

21   individuals that were involved in other crimes, not only

22   Medicaid fraud but money laundering and wire fraud and then

23   narcotics conspiracy for buying and selling Oxycodone and

24   Oxymorphone.  None of those things my client has ever been

25   involved in.  History-wise as your Honor knows this is his

1  first contact with the criminal justice system, but he was

2  involved in the Medicaid fraud to the degree that is outlined

3  in the presentence report and to the degree that was stated by

4  Mr. Diskant.

5          The only issue I take, and it is just a slight issue,

6  is with regard to these drugs that my client did collect.  I

7  don't believe that my client was involved in adulterating the

8  medications whereby taking lighter fluid to peal off the labels

9  on medications.  I believe from the PSR that all of the

10 medications that were found when the search warrant was

11 executed at his residence indicated that the bottles were in

12 there original condition as they were sold to him, that they

13 were not lighter fluid or chemicals.  He was not part of that

14 process, that sophisticated process.  That took place by the

15 aggregators that he sold to and other aggregators.  It is

16 beyond dispute that, your Honor, that storing medications such

17 as these in your apartment under unsanitary conditions and

18 under conditions which medications is not to be stored is

19 certainly -- these drugs were diluted and they shouldn't have

20 been kept in that condition.  I am just saying there is a

21 little bit more of a level of sophistication of taking lighter

22 fluid and pealing off the labels that he wasn't directly

23 involved in.  Certainly it is part of the overall conspiracy

24 and his involvement in the conspiracy is not challenged in any

25 regard, your Honor.  I wanted your Honor to take that into

1    account in terms of where this defendant falls in terms of his

2    participation in the case.

3         I will say also, your Honor, as Mr. Diskant said that

4    the two sales that he is being held responsible for here that

5    took place when he sold to a cooperating witness, his profit on

6    that was $9,000.  There were two sales as Mr. Diskant noted.

7    There is a Medicaid value of about $100,000.  We don't dispute

8    the total amount of restitution that is due here.  I think it

9    is $168,000.  A little bit over $168,000.  That is correct and

10   my client does -- $184,000 -- and my client does intend to pay

11   that money.

12        Your Honor, I am asking I think, your Honor, in this

13   case for a very reasonable request here.  His guidelines

14   sentencing range is between 18 and 24 months.  There is an

15   alternative sentence here that I think makes sense on so many

16   different levels legally and factually and what is just fair

17   and appropriate here.  What I asked your Honor to impose is a

18   sentence of five years' probation with home detention and

19   continued community service that he has already been engaged in

20   for the last year and a half in his own community.  The reasons

21   are very simple, your Honor.  First of all, your Honor, this is

22   my client's only contact with the criminal justice system.  He

23   has been here for over 18 years.  He has tried, your Honor, to

24   the best of his ability to make amends for his conduct over

25   that year and a half.  He has made every single effort that we

could ask of a defendant to do.  He has done it openly.  He has

done it wholeheartedly.  He has done it without reservation.

He did try, your Honor, to cooperate with the

government.  He met with agents on numerous occasions on the

streets of Newark.  This is somebody, your Honor, that has his

ear to the ground in Newark as a bodega owner.  He knows what

is going on in the street.  Every single person that comes into

his bodega is not just somebody who has frequented his bodega.

They are people that he knows and his family knows from the

community.  They are friends and acquaintances.  Your Honor, he

put that in some sense on the line, your Honor, by meeting with

the agents, letting them know what is going on in the community

and trying as best he could, your Honor, to provide information

that would be helpful to the agents in bringing further cases

with regard to Medicaid fraud but also with regard to other

criminal offenses that he knew were going on around him.

Again, your Honor, it was through no fault of his own that that

did not pan out and there were no arrests based on information

he gave.  But this was someone, your Honor, that recorded more

than 20 telephone calls over a four-month period.  This was

somebody who in broad daylight would go into the agents' car

and meet with them.  This could have put him and his family at

risk if it were discovered.

But, your Honor, there is legal leeway for your Honor

to impose based on that non-5K1 cooperation a nonguideline

1  sentence in this case.  That was as I cited *United States v.*

2  *Fernandez* where Judge Cote actually did not impose a reduction

3  because the defendant in that case, while he began to

4  cooperate, he was deceitful with the government and that is why

5  his relationship with the government terminated.  Here, your

6  Honor, that is not the situation.  In this case, his

7  cooperation was terminated again through no fault of his own.

8  And I think most telling, your Honor, was what Judge Cote said

9  in that case, Cooperation is not simply agreeing to help the

10  government for the sake of helping the government.  It also

11  shows the willingness on the part of a defendant who has

12  decided to make a clean and full break and change in a

13  significant way their choices that they make in life.  We're

14  not talking about here, your Honor, a defendant who was engaged

15  in other criminal conduct, in multiple fast criminal conduct

16  that had dealings with organized crime.  This is a simple

17  person, a family man, whose crime pertained to this Medicaid

18  fraud conspiracy who tried to make amends by his cooperation.

19  And I think, your Honor, that that goes to his character, his

20  history, and a real reflection on his part to want to make

21  amends for his criminal conduct.  I think in that case it is

22  put beautifully by Judge Cote that that would be factored into

23  the sentence in deciding whether to give a defendant a

24  nonguideline sentence.

25          Secondly, your Honor, this was not only backed up --

his cooperation and his desire to make amends for his conduct

in this case -- was not only backed up by his cooperation, but

it was backed up by deeds and by actions.  That was, your

Honor, he has been out and Pretrial Services has been

monitoring him.  He has been out for the last year and a half,

a significant period of time.  As your Honor can read from the

presentence report, there has been never been an issue.  He has

always been prompt.  He has abided by all of those conditions

over that year and a half, which again, your Honor, I think are

indicative of what the future would hold for him in terms of

his compliance with a probationary sentence.

But, your Honor, on his own volition, not through

Pretrial Services, he went out into his community into Newark

again as a person of the people living there working in the

bodega there and he volunteered over 100 hours, your Honor, to

a local not-for-profit community center that the name is Focus

that serves the needs and the poor and the elderly of Newark by

providing meals, education and employment training.  I provided

a letter in my submission to your Honor from the director of

the program who basically said, your Honor, what I am saying

here about him.  He is dependable.  He is reliable.  If he says

he is going to do something, he does it.  His partition in that

program, your Honor, I think again, your Honor, really speaks

to a desire to make amends for the conduct.

The conduct here, your Honor, is that his conduct he

deceived not only the insurance companies but the people that

he was living with, the people living in his community were

deceived.  These were people who should have been taking their

medication.  These were poor people.  These were elderly

people.  The crime is somewhat of a crime of betrayal to his

own people, the community service he involved himself in.  I

think that speaks volume of that desire do amend that, to make

that right going forward.  Your Honor, the program has agreed

that they would have him continue his participation in that

program.  This is someone that works seven days a week but

still finds time to do that community service.  And how

valuable is that community service to his community and to the

government versus putting him in a jail cell to spend his time

there in a jail cell.  I think that is one of the reasons of a

condition of probation I am asking for.

Again, your Honor, this is somebody who has had no

criminal contact.  This is someone who supports his children.

This is someone who works seven days a week.  It is pretty

simple.  That is who he is.  He works.  He provides for his

family.  He wants, as any father, for his children to do better

than he has done.  The Supreme Court has noted in *Pepper v.*

*United States* that the Court may take into account

rehabilitative efforts that defendant has undertaken during the

term of a case as evidence of the character of the defendant

and likelihood of rehabilitation, which are all goals that are

1  mentioned under Section 3553 as goals that sentencing should

2  promote.

3       I think also, your Honor, very, very basically just to

4  put it out there, a sentence should certainly fit the criminal

5  conduct that a defendant engages in.  It is hard to think of a

6  crime in the federal system where jail fits a crime that is

7  committed.  Your Honor, the sentence should also fit the

8  offender.  If this is an offender who has made those

9  rehabilitative efforts over the last year and a half and there

10 is an alternative sentence that can promote those sentencing

11 guidelines of rehabilitation, paying back to the community,

12 other people seeing in the community seeing what he has engaged

13 it, it is my belief that is the sentence that should be

14 imposed.

15      There is always going to be time to send Mr. Leyba to

16 jail if he messes up on probation.  The fact of the matter is

17 he comes to court this morning showing a year and a half of

18 compliance, of give back and of cooperation, which shows there

19 will be no slipup and that he will continue to maintain living

20 a crime-free life.  More substantially, your Honor, a life of

21 purpose, a live of giving back, a life to his family.  There is

22 that alternative punishment that again fits the crime but more

23 basically fits the offender.

24      Lastly, your Honor, Mr. Leyba is a legal permanent

25 residence of the United States.  He is green card holder.  He

1    has been here for the last 18 years. He has children here. He

2    has family here. This criminal conviction which he pled guilty

3    to subjects him to mandatory deportation if immigration should

4    come for him. He will not be allowed to renew his green card.

5    If he is deported, your Honor, he will never be able to come

6    back into the United States. I represent 90 percent of

7    noncitizens as part of my criminal practice and those facts and

8    consequences are sure and certain. This district, as well as

9    the Eastern District, has recognized that that is a factor that

10    the Court can take into account in deciding whether to give a

11    non-jail sentence or nonguideline sentence is those severe

12    immigration consequences that follow from a criminal

13    conviction, specifically such as this which is classified as an

14    aggravated felony under immigration law.

15         Again, if we just take ourselves out of this courtroom

16    for a second and think about it logically, this is someone that

17    has lived here for 18 years. He has his whole family here. He

18    has a living here. He has a job here. He has people that care

19    about him here. If we take him and deport him to a country

20    where he has nothing, how severe a punishment is that? I think

21    that is why the courts in this district and other districts

22    have recognized that that is a severe consequence that can

23    mitigate your Honor imposing a guideline sentence. It comes

24    down to, your Honor, when is it enough? When is the punishment

25    enough? How much should a defendant have to suffer? How much

1    should the defendant have to pay?  I think, your Honor, again

2    he has done everything from A to Z during this year and a half

3    so he can stand before your Honor I say, I have rehabilitated.

4    I have done everything asked for me.  I will continue to do

5    those things.  Just don't take me away from my family and let

6    me continue to do those things that I have always been doing.

7            To that end, your Honor, the restitution that he is

8    going to be required to make of $184,000 of course it goes

9    without saying that if he is put in prison, which costs the

10   Bureau of Prisons these days $29,000 a year, I think he pays

11   $25 a quarter if he is working in prison to start repaying that

12   restitution.  Certainly, your Honor, if he gets deported, he is

13   not going to be paying that restitution.  Again, what better

14   way to address the criminal conduct in this case then to make

15   him pay that money at 10 percent of his gross earnings.  This

16   is someone who works seven days a week.  This is someone's

17   family who can kick in.  They want to make restitution.  They

18   want to give back to the community.  They want to give it back

19   to the government.  Let him do it.  If he slips up, messes up,

20   then we'll send him to jail for whatever time the Court deems

21   is reasonable.  Let him pay that restitution by continuing to

22   work in a legal way in order to fulfill his obligations under

23   this case to address his criminal conduct.

24           Your Honor, my client would like to address the Court.

25   I have had the pleasure, your Honor, of meeting his niece whose

E936leys

1    name is Heidi Malave.  She is 20 years old.  She attends

2    Sanford University.  She is an exceptional young lady.  She

3    grew up with Mr. Leyba.  If it is okay she wanted briefly to

4    address the court with regard to Mr. Leyba.

5            THE COURT:  I will hear from Mr. Leyba.

6            Before I hear from Mr. Leyba, Mr. Diskant, can you

7    identify aggregators to which this defendant supplied drugs and

8    what became of those?

9            MR. DISKANT:  Yes, your Honor.  We identified at least

10   two of them.  One of them is the individual identified in the

11   complaint as CW1.  CW1 knew the defendant because the defendant

12   had been selling to CW1 for a period of time before CW1 was

13   arrested.  A second was an individual named Eladimir Ricorigo.

14   Mr. Ricorigo has pled guilty.  His case is pending before Judge

15   Sweet.  His sentencing is scheduled for October.

16           MR. KRATKA:  I didn't know that, your Honor.  I am

17   hearing this for the first time, that Eladimir pled guilty.

18           Was any of the information that my client supplied

19   about him used in any regard to obtain that guilty plea?

20           MR. DISKANT:  No.

21           MR. KRATKA:  Your Honor, I am pointing this is one of

22   several individuals that my client knew of.

23           THE COURT:  Mr. Leyba, anything you want to say before

24   I impose sentence?

25           THE DEFENDANT:  Yes.  Your Honor, I ask wholeheartedly

1   I would like to state from my heart that I am very sorry for

2   the mistake that I committed against the United States.  I have

3   tried to make amends and do my best that I can do during the

4   year and a half that I have done and gone through this process.

5   I five children in this country.  I thank this country for all

6   the opportunities it has given me.  My children are American

7   citizens and they deserve respect from me towards them.  For

8   that reason I ask for forgiveness for having committed the

9   mistakes that I committed.  After I participate in helping the

10  community and I have done my best in order to start anew to

11  become a better person every day.  And what I say to you I am

12  saying it from my heart.  These are the words that I have to

13  say to you.

14        THE COURT:  I reviewed the presentence report and I

15  accept the factual recitation in the presentence report.  The

16  guideline range as calculated is a total offense level of 15

17  and criminal history category I.  I have also reviewed the

18  submission by the defendant and considered the arguments made

19  by both sides here today and the statements made by the

20  defendant.

21        In this case I think that it is a reasonable sentence

22  based on the factors that I have considered relevant to

23  sentence in 18, U.S.C., 3553(a) to sentence the defendant to a

24  period of probation as recommended by the defense.  I have

25  taken into consideration the defendant's attempt to cooperate

E936leys

even though it was not to the level warranting a 5K letter from
the government.  In light of lack of prior criminal history,
his age at 41 years old, that I will say it is aberrant
behavior over an isolated period of time of an offense which
the defendant was involved.  I will also consider that he is
facing immigration consequences, but I think also that a period
of home confinement and further community service given the
nature of this offense is appropriate.  So I am going to impose
a period of three years' probation with a condition of six
months' home confinement with an exception to be made by
Probation for a reasonable period of time to be outside of the
home related to employment.  I will also impose 200 hours of
community service to be done during the period of probation.  I
will order restitution and sign the order of restitution
proposed by the government in the amount of $184,123.  I will
also have to impose the mandatory $100 special assessment.

The mandatory conditions of probation are imposed.
The defendant shall not commit another federal, state, or local
crime; defendant shall not illegally possess a controlled;
defendant shall not possess a firearm or destructive device.
The mandatory drug testing conditions is suspended based on the
recommendation and this Court's determination that the
defendant poses a low risk of future substance abuse.
Defendant shall also cooperation in the collection of DNA as
directed by the Probation Office.

1    The standard conditions of supervision 1 through 13 is

2  recommended by the presentence report.  I also impose the

3  special conditions:  Defendant shall provide the Probation

4  officer with access to any requested financial information;

5  defendant shall not incur any new credit card charges or

6  additional lines of credit without the approval of the

7  Probation officer unless the defendant is in compliance with

8  the installment payment schedule.  The defendant shall also

9  obey the immigration laws and comply with the directives of

10  immigration authorities.  Defendant shall submit his person,

11  residence, place of business, vehicle or any other premises

12  under his control to a search on the basis the Probation

13  officer has reasonable belief that contraband or evidence of a

14  violation of the conditions of release may be found.  The

15  search must be conducted at a reasonable time and in a

16  reasonable manner.  Failure to submit to a search may be

17  grounds for revocation.  Defendant shall inform any other

18  residents of the premises that the premise may be subject to

19  search pursuant to this condition.  The defendant is to report

20  to the nearest Probation Office within 72 hours of entry of

21  today's judgment.

22    Restitution shall be made payable to the Clerk of

23  United States District Court with disbursement to the New York

24  State Department of Health in the amount stated.  Restitution

25  shall be paid in monthly installments of 10 percent of gross

E936leys

1    income over the period of probation supervision to commence 30

2    days after the date of entry of judgment in this case or on any

3    other schedule based upon Probation's determination of

4    availability of income to pay a greater or lesser amount of

5    restitution.

6            Defendant shall notify the United States Attorney for

7    this district within 30 day of any change of mailing or

8    residence address that occurs during the course of restitution

9    that remains unpaid.  The defendant shall be supervised in the

10   district and by the district of his residence.

11           Mr. Leyba, you have the right to appeal this

12   conviction and sentence to the extent you have not waived this

13   right at the time of your plea.  If you wish to appeal this

14   conviction and sentence, you must discuss it immediately with

15   your attorney in order to preserve your right to appeal.  A

16   notice of appeal must be filed on your behalf within 14 days of

17   entry of today's judgment.

18           Mr. Diskant, anything further?

19           MR. DISKANT:  Two very brief matters.  I believe

20   technically, your Honor, because Probation is not available for

21   this sentence, the sentence should read time-served to be

22   followed by three years of supervised release as opposed to a

23   sentence of probation.  It achieves the same effect.  Given his

24   guideline provision is not within Zones A and B, therefore

25   probation is not --

E9361eys

| | |
|---|---|
| 1 | THE COURT: Probation is not provided under the |
| 2 | guidelines, but the guidelines are not mandatory and it is not |
| 3 | statutorily prohibited. |
| 4 | MR. DISKANT: I believe it is, your Honor. I believe |
| 5 | it achieves the same end. The judgment needs to be read |
| 6 | time-served to be followed by. |
| 7 | THE COURT: What provision do you believe that makes |
| 8 | probation statutorily ineligible? |
| 9 | MR. DISKANT: Your Honor, I don't have it in front of |
| 10 | me. The presentence report is consistent with that. It lists |
| 11 | the defendant as ineligible for probation on page 19. I can |
| 12 | put in a letter if the Court would like one. |
| 13 | THE COURT: Let me look at page 19. |
| 14 | MR. KRATKA: Paragraph 78 on page 15. |
| 15 | THE COURT: Paragraph 78. That's not what paragraph |
| 16 | 80 says. |
| 17 | MR. DISKANT: Your Honor, that's correct. I believe |
| 18 | paragraph 80 is speaking of -- that's fine, your Honor. |
| 19 | THE COURT: I will go back and look at the statutory |
| 20 | provisions. I understand your position. I have confronted it |
| 21 | before. My position is that the guideline ineligibility of |
| 22 | probation is the same as the guideline -- whether the mandatory |
| 23 | nature of the guidelines themselves. And it is superseded and |
| 24 | controlled by the statutory availability or prohibition of |
| 25 | probation. I don't have a problem if both sides agree that |

E936leys

1    time-served in a period of supervised release is appropriate

2    instead of probation.  I still would be curious and you can

3    still submit to me at some point for future reference why you

4    say that simply if it is a guideline eligibility why

5    statutorily this Court is prohibited from giving probation when

6    Congress provides for a statutory period.  That is my

7    understanding of the eligibility for probation or ineligibility

8    for probation.

9           Do you have a position, Mr. Kratka?

10          MR. KRATKA:  I don't, your Honor.

11          Can I confer with Mr. Diskant for a moment?

12          THE COURT:  Yes.

13          (Pause)

14          MR. KRATKA:  Judge, after conferring with Mr. Diskant,

15   I don't have a preference one way or another.  I have no

16   objection to either way the Court wishes to proceed.

17          THE COURT:  My preference is that his criminal record

18   then reflect that he received a probationary sentence rather

19   than a time-served sentence.

20          MR. DISKANT:  Your Honor, that's fine.  I will do a

21   little research.  If I am incorrect, I can put in a letter.

22          THE COURT:  Let me impose the sentence as indicated.

23   If you believe that resentence is appropriate or if you can

24   submit to me for future reference that will be useful to me.

25   My clear recollection of the research and my consistent

E936leys

1    position has been that the guidelines -- there is nothing about

2    the guideline provisions at this point that are mandatory and

3    controlling and prevents this Court from exercising the

4    statutorily authorized sentence to be imposed in cases.  If

5    there is a provision that says that a nonincarceratory sentence

6    is imposed or incarcerator sentence or are any other provision

7    of sentence that the guidelines prohibit a judge from imposing

8    a statutory authorized sentence and really that is not my view

9    of the law.

10              So any open counts?

11              MR. DISKANT:  The other matter is that the government

12   would move to dismiss the open count at this time.

13              THE COURT:  That application is granted.

14              Anything further, Mr. Kratka?

15              MR. KRATKA:  No, your Honor.

16              THE COURT:  That's is the sentence.

17              MR. DISKANT:  Thank you, your Honor.

18                             o0o

19

20

21

22

23

24

25